UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARGIE DELOZIER; individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | No. _____ |
| v. | ) ) ) | **CLASS ACTION COMPLAINT** |
| JACOBS ENGINEERING GROUP, INC. and THE TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Come now the Plaintiffs, by and through counsel, pursuant to law, to file this Complaint and state as follows:

## INTRODUCTION

1.     Plaintiffs, individually and on behalf of all others similarly situated, by and through the undersigned counsel, alleges the following:

2.     Plaintiffs are owners of private property and/or residents of private property in Roane County, Tennessee who complain of environmental contamination and polluting events upon their property and their persons caused by the conduct and activities of the Defendants herein.  Defendants have caused the dispersion of coal ash and its fugitive dust onto the Plaintiffs and their properties, as well as the surrounding private homes and businesses. Coal ash contains toxic constituents, including but not limited to, heavy metals, including lead, arsenic, mercury, cadmium, chromium and radionuclides. Where,

as here, Coal ash and its fugitive dust is ingested, inhaled and/or deposited on private property, surface and groundwater; it does great damage to Plaintiffs' health, safety, and welfare. It is injurious to property and unreasonably interferes with the comfortable enjoyment of life and property. Plaintiffs assert claims for personal injury, property damage, trespass, nuisance, and medical monitoring.

3.      The stigma surrounding the spill caused negative economic detriment on a County-wide scale that was caused and enhanced by fraud and other conduct to be referenced by similar actions in law and fact committed by the Defendants. Such actions have harmed the communities to such a great extent that legal action must be maintained and should be consolidated as a matter of law. Moreover, people who frequented or resided in a confined area near the spill would not have been harmed in health, or otherwise, had the fraudulent conduct not occurred. This action is such that since the defendants have fraudulently deviated from their obligations in law and in contract in a continuous ongoing nature, plaintiffs were left with no alternative other than to seek access to the Court to protect their economic and health interests. The actions complained of herein include, but are not limited to, recent leaks of arsenic, asbestos and radiation in excess of permissible exposure limits (PEL) which were concealed by these defendants from the public resulting in unsafe water and unsafe air posing risks to the health of citizens in the vicinity of the Kingston TVA facility (KIF).

**NATURE OF THE CASE**

4.      Plaintiffs bring this action against Defendant TVA as a result of the catastrophic spill on December 22, 2008, of toxic coal ash sludge from containment structures at a

Class II landfill at TVA's Kingston Fossil Plant, located at the confluence of the Emory and Clinch Rivers near the City of Kingston, Roane County, Tennessee.

5.     The TVA's Kingston Fossil Plant is a coal-fired power plant which produces electricity. Ash and other coal combustion products ("CCPs") are waste products of burning coal. The ash waste is processed, handled, stored, and controlled in various containment structures such as settling ponds, retention ponds, dredge cells, pools, drainage channels, and by other systems, equipment, and methods, by Defendant TVA at the Kingston Fossil Plant.

6.     The ash waste containment structure which failed was, in 1995, the subject of a settling pond closure plan submitted by Defendant TVA to the Tennessee Department of Environment and Conservation, Solid Waste Management Division ("SWM"). However, pursuant to discussions with SWM, Defendant TVA agreed that the closure of the settling pond constituted the operation of a Class II landfill and in June 1999 modified the settling pond closure application to an application for a Class II landfill for the disposal of ash waste. The SWM issued Defendant TVA the requested Class II landfill permit on September 26, 2000.

7.     The spill of ash sludge resulted from the breach of an earthen dike or retention wall enclosing a 98-acre containment structure containing ash waste. The spill released more than 5.4 million cubic yards, equivalent to more than one billion gallons, of ash sludge into the Emory, Clinch, and Tennessee Rivers, which are waters of the State of Tennessee, and flooded a wide swath of the adjacent valley, covering more than 300 acres

of land adjacent to the plant and onto the land of more than thirty-six residential properties, sweeping some of them off their foundations.

8.     Defendant TVA knew or should have known that the ash sludge which spilled contains toxic pollutants including arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, selenium, thallium, and other pollutants, including radioactive substances, which are extremely hazardous to human health. For example, arsenic and chromium are known to be human carcinogens. Lead and thallium are, among other things, extremely neurotoxic and can cause birth defects and reproductive system disorders.

9.     A 2007 inventory filed by TVA with the EPA shows that in just one year TVA deposited more than 2.2 million pounds of toxic materials in the containment structures of the Class II landfill which ultimately failed. The inventory also showed that in just one year the plant's byproducts included 45,000 pounds of arsenic, 49,000 pounds of lead, 1.4 million pounds of barium, 91,000 pounds of chromium, and 140,000 pounds of manganese. These metals are toxic to human health and can cause cancers, liver damage, neurological damage, and other health problems.

10.     Defendant TVA knew or should have known that there were problems with the containment structures of the Class II landfill which made it foreseeable and highly likely that they would fail and release massive quantities of the toxic waste into the environment.

11.     Testing by the EPA and other organizations after the spill shows levels of toxic metals in sediment and water samples to be above regulatory limits, including some arsenic levels which are 149 times the maximum allowable level.

12.     TVA concealed new radiation and arsenic leaks into the groundwater beyond permissible exposure limits (PELS).

13.     TVA concealed new airborne asbestos leaks into the Roane County community in 2019.

14.     Throughout numerous years, beginning in 2009, TVA concealed from the Roane County community poisonous particulate matter at a hazardous particulate size (>2.5 microns) in an amount in excess of 5.6 million pounds to be inhaled by the citizens of the Roane County community.

**JURISDICTION AND VENUE**

15.     This Court has original jurisdiction over this action under both 28 U.S.C. §§ 1331 and 1337 as a civil action arising under an Act of Congress regulating commerce, namely the Tennessee Valley Authority Act of 1933 ("TVA Act"), as amended, 16 U.S.C. §§ 831 et seq.

16.     Defendant TVA is a wholly owned federal corporation which, under the TVA Act, 16 U.S.C.§ 83l, may sue and be sued in its corporate name.

17.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18.     Venue is proper in this Court under 28 U.S.C. § 139l(b) because (a) Defendant TVA's principal place of business is located in Knoxville, Tennessee, and thus it resides in this judicial district, (b) the events or omissions giving rise to the claims in this action occurred in or near Kingston, Tennessee which is in this judicial district, and (c) all the properties involved in this matter reside in this district.

## THE PARTIES

19.     Plaintiff Margie Delozier is a citizen of Harriman Tennessee, and property owner who resided at 106 Robbins Road, Harriman, Tennessee, 37748, at all times relevant herein. Plaintiff and her family have ingested, inhaled and had direct dermal contact with coal ash through the air and/or in the surface and subsurface soil and water. This exposure continues to the present day.

20.     Defendant Jacobs Engineering Group, Inc. (hereinafter "Jacobs") is a foreign corporation with its principal place of business in Pasadena, California. Jacobs Engineering Group, Inc., was licensed to do business, and was and is doing business, in the State of Tennessee, Roane County, and elsewhere, and is directly liable for all actions contained herein. Jacobs may be served through its Registered Agent for Process, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

21.     The Tennessee Valley Authority (hereinafter "TVA") is, in part, a private entity that began selling fly ash from Kingston commercially for profit during the hazardous waste cleanup, a/k/a asset recovery, unbeknownst to many, and said dollars could have paid for much needed monies to the community to compensate for certain damages that

were incurred that were fraudulently concealed. TVA may be served with process at 400 West Summit Hill Drive, Knoxville, Tennessee 37902.

## BACKGROUND REGARDING COAL ASH

22.     Coal ash, also referred to as coal combustion residuals or CCR's, is produced primarily from the burning of coal in coal-fired power plants. Coal ash is generally alkaline and contains high levels of toxic heavy metals such as arsenic, boron, lead, selenium, and hexavalent chromium.

23.     Water that comes in contact with coal refuse and coal ash waste creates leachate that enters ground or surface waters threatens the health of local communities, makes groundwater unsafe to drink, harms aquatic and other wildlife, and pollutes rivers and streams.

24.     If ingested or inhaled, these toxicants can cause cancer and nervous system impacts such as cognitive deficits, developmental delays and behavioral problems. They can also cause heart damage, lung disease, respiratory distress, kidney disease, reproductive problems, gastrointestinal illness, birth defects, and impaired bone growth in children.

25.     The Environmental Protection Agency (EPA) has found that living next to a coal ash disposal site can increase the risk of cancer or other diseases.[1]

_____

[1] U.S. Environmental Protection Agency (EPA), "Human and Ecological Risk Assessment of Coal Combustion Wastes" (draft). (Released as part of a Notice of Data Availability) Aug. 6, 2007.

**STATEMENT OF THE CASE**

26.     On Monday, December 22, 2008, an ash waste containment structure surrounding portions of a Class II landfill owned and operated by the Defendant TVA at its Kingston Fossil Plant near Kingston, Tennessee, failed, releasing more than one billion gallons of sludge and water into the nearby environment.

27.     The release of toxic ash sludge from the containment structures of the plant's Class II landfill created a tidal wave of water and toxic ash sludge which destroyed several homes, covered local roads and a railroad spur, contaminated drinking water wells and municipal water intakes, damaged water lines, killed fish and other flora and fauna, and ruptured a major gas line in a neighborhood adjacent to the plant.

28.     Public access on Swan Pond Road past the Kingston plant remained closed except for residents and persons with official business.

29.     An aerial survey completed on December 24, 2008, shows that approximately 5.4 million cubic yards of ash sludge was released onto land adjacent to the plant and into the nearby Clinch and Emory Rivers. The ash sludge covered more than 300 acres.

30.     The ash sludge is contaminating, and will continue to contaminate in the future, the groundwater, surface water, air, soil, flora and fauna of the environment and Plaintiffs' properties.

31.     Kingston is one of TVA's larger fossil plants. It generates 10 billion kilowatt hours of electricity a year.

32.     Ash waste is a by-product of coal-fired power plants and is stored in containment structures such as settling ponds, dredge cells, dikes, and other structures. The

containment structure of the Class II landfill which failed covered about 90 acres. It was one of three containment structures at the Kingston Fossil Plant.

33.     Federal studies demonstrate, and it has long been known, that coal ash contains significant quantities of heavy metals like arsenic, lead and selenium, which can cause cancer and neurological problems.

34.     A 2007 draft report by the federal Environmental Protection Agency found that fly ash, a byproduct of the burning of coal to produce electricity, contains significant amounts of carcinogens and retains the heavy metals present in coal in far higher concentrations. The report also found that the concentrations of arsenic to which people might be exposed through drinking water contaminated by fly ash could increase cancer risks several hundredfold.

35.     A 2006 study by the National Research Council found that these coal-burning by-products "often contain a mixture of metals and other constituents in sufficient quantities that they may pose public health and environmental concerns if improperly managed." The study further said that "risks to human health and ecosystems" might occur when these contaminants entered drinking water supplies or surface water bodies.

36.     Other studies show that mean concentrations of lead, chromium, nickel and arsenic are three to five times higher in the Appalachian coal that is mined near Kingston than in Rocky Mountain or Northern Plains coal.

37.     Independent testing of water samples collected downstream from the water which was affected by the ash sludge and which spilled from TVA's Kingston Fossil Plant shows high levels of arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel,

selenium, thallium, and other pollutants, including radioactive substances, some of which exceed regulatory limits.

38.    Containment structures and retention dikes enclosing the Class II landfill are inspected by Defendant TVA. An inspection by TVA in December 2007, for example, showed there were numerous problems with the containment structures enclosing the Class II landfill, and its airborne particulate, it hid from the county in excess of 5.6 million pounds of toxic particulate matter.

39.    The various containment structures and retention dikes enclosing the Class II landfill and other waste retention and control systems at the Kingston Fossil Plant have suffered numerous problems in the recent past, including leaks, seepages, and "blowouts."

40.    Defendant TVA's December 2007 inspection, and the "Annual Ash Pond Dike Stability Inspection Report" dated February 15, 2008, reported that the ash retention ponds, dredge cells, containment structures, dikes, and other components of the ash and coal combustion products ("CCPs") waste processing, storage, and control system suffered from the following defects and failures:

     a.    floating ash creating a danger of offsite release;

     b.    seepage from dikes;

     c.    rutting of dike roads;

     d.    leaks in toes of the dikes;

     e.    overcapacity of dredge cells;

     f.    inability to absorb or drain rain or storm water;

g.      bench rutting;

h.      slope failures;

i.      inadequate internal drainage;

j.      infiltration of surface water on existing dike benches;

k.      anomalies in subsurface conditions;

l.      standing water;

m.      lack of vegetation;

n.      previous blow outs;

o.      water levels in dredge cells which were too high;

p.      poor bench drainage;

q.      improper bench grading;

r.      insufficient and inadequate drainage repairs;

s.      staining due to leaching out of substances from the bottom ash in the dredge cells;

t.      insufficient removal of plants and trees which had damaged dredge cell slopes;

u.      insufficient clean out of basins, drainage ditches, and discharge ditches and sluices;

v.      breaching of check dams;

w.      erosion of dikes;

x.      unstable rip-rap;

y.      impeded flow of dredge cell drainage ditches;

z.      insufficient number of spring boxes to control or relieve water pressure;

aa.     inadequate monitoring of drain areas and exterior dike slopes for seepages, soft wet spots, animal burrowing, and sloughing;

bb.     inadequate dredging of drainage basins to restore design contours and protect pumps from further damage; and

cc.     excessive vegetation growing inside spillway structures.

41.     The containment structures enclosing and surrounding the Class II landfill were not properly designed, constructed, or maintained to withstand freezing temperatures or heavy rainfall and as a result suffered significant instability and failure.

42.     Noticeable seepage and leaking of containment ponds at the Kingston Fossil Plant were discovered in 2003 and 2005 but had not been adequately repaired by Defendant TVA.

43.     The ash sludge is stored in a wet, rather than a dry, form in unlined containment structures, thereby contributing to its propensity to escape confinement and to contaminate the environment.

44.     The foregoing defects, failures, and conditions, among others, contributed to, aggravated, worsened, or caused the ash spill.

45.     Defendant TVA knew or should have known that there was a history of problems, warning signs, previous blowouts, leakages, erosions, instability, seepage, and overcapacity, among numerous other problems, with its ash waste handling and storage system, including the containment structures enclosing and surrounding the Class II landfill.

46.     Despite the foregoing knowledge, Defendant TVA chose to ignore these problems, failed to remedy these problems, failed to warn regulators, the public, or the Plaintiffs, and intentionally concealed or misrepresented the existence and nature of the dangerous problems with its ash waste handling and storage system, including the containment structures enclosing and surrounding the Class II landfill.

47.     Plaintiffs' and the putative classes' property was inundated and damaged by toxic ash sludge from the spill which remains on their property or was impacted and damaged by its proximity to the spill.

48.     Plaintiffs' and the putative classes' real property and residences were severely damaged by the ash sludge and have been rendered uninhabitable and/or inaccessible and permanently contaminated, or have been impacted and damaged by their proximity to the spill.

49.     The health and well-being of Plaintiff and the putative class has been severely damaged and threatened by the ash spill.

50.     The events described herein took place primarily in the area surrounding the TVA KIF Superfund Cleanup Site which Defendants referred to as an asset recovery.

51.     The asset recovery occurred and continues to occur to the present day, due in part to hidden, ongoing, and new current leaks of fly ash constituents on or about 2017-2019, including radiation and arsenic into the surrounding groundwater above permissible exposure limits that the TVA attempted to hide from TDEC and the Roane County Community, including Plaintiff and the putative class.

52.     The leaks and publicity surrounding the largest environmental disaster in United States history have negatively stigmatized Roane County, Tennessee, and the surrounding community in its entirety and continues to the present day

53.     This nuisance has been unfairly aggravated by a negative environmental perception and stigma attaching to the community and other material factors.

54.     The nuisance could and should have been limited in geographic scope and time impacting a smaller area of the county but for the actions of the defendants, who promised all community leaders fly ash was safe, the job of abating the hazardous nuisance was complete without remaining hazard, and free from health concerns.

55.     Defendants are still subject to and bound by continuing obligations of the EPA's Administrative Order of Consent ("EPA AOC").

56.     Defendants are subject to and bound by continuing obligations of the contract by and between the defendants ("Jacobs / TVA contract").

57.     Due to the actions of the Defendants, as further described herein, the entire Roane County community was harmed beyond what would have occurred if a competent and responsible remediator, instead of Jacobs, was performing the cleanup task(s) required following the spill with integrity, efficiency, and absent a callous disregard for human health.

58.     Due to the reckless nature of the improper remediation, new radiation and arsenic leaks occurred in 2017 and the leaks continue to the present day.

59.     TVA hid the leaks and the extent and severity of the leaks from the public.

60.     Further, most recently, TVA attempted to conceal asbestos containing material that was discovered at the site by a site worker and upon information and belief leached and leaked into the environment through migration to Roane County roads and its citizens. This further contributed to the harm and the nuisance.

61.     As a result of the conduct of these Defendants, each of the plaintiffs and their citizens are damaged proprietarily, economically, and medically, and have further suffered aggravation and inconvenience.

62.     Defendants actions, as described herein, are on-going and daily increase the damages suffered by Plaintiffs.

63.     Jacobs was the prime contractor at the KIF cleanup and was to abide by the EPA Agreed Order of Consent ("EPA AOC"), the TVA contract ("Jacobs / TVA contract") and the site wide safety and health plan ("SWSHP") to manage the site cleanup and provide a safe environment for the surrounding community that could be exposed to the constituents of the fly ash due to activity at the KIF toxic spill remediation site.

64.     The Defendants were under a legal obligation to preserve certain evidence, but instead destroyed it.

65.     At all times material herein, Jacobs acted outside the scope of direction of the EPA, TDEC, existing law, and the authority conferred by contract with the TVA, and at all times contrary to the Site Wide Safety and Health Plan (SWSHP).

66.     The SWSHP was to be strictly followed and was a mandate to be followed by all who worked on or near the site, but yet it was never disseminated by these Defendants.

67.     Jacobs was to provide complete safety oversight for TVA and the EPA.

68.     The SWSHP was designed to be mandatorily followed for the safety of the public but it was hidden from them by these Defendants.

69.     Defendant Jacobs drafted the SWSHP primarily with the approval of Defendant TVA.

70.     TVA and Jacobs crafted a bonus and compensation structure that encouraged the pursuit of profit over considerations of safety.

71.     Jacobs was at all times to operate independently and was contracted by the TVA to use their expertise to employ qualified individuals with professional competence to protect the public.

72.     The personnel provided by Jacobs did not have the requisite expertise.

73.     Jacobs intentionally and recklessly deviated from the scope of authority set forth in the contract with TVA, the EPA Administrative Order of Consent and the SWSHP.

74.     The actions of Defendant Jacobs were in direct conflict with these orders and contracts.

75.     A limited number of TVA agents or employees unduly influenced decisions regarding Jacobs obligations to disregard safety in the pursuit of profit, e.g. their own personal bonuses.

76.     The TVA recklessly/negligently selected Jacobs as the prime contractor for the site.

77.     The TVA recklessly/negligently failed to properly interact with Jacobs to the extent that TVA was placed on constructive notice of the hazardous conditions of the site and the danger to the community surrounding the site.

16

78. The inactions by the TVA under the circumstances in which they were involved in the largest environmental disaster in U.S. history proximately caused or contributed to all allegations of damages to these plaintiffs and their citizens contained herein.

79. The inactions by the TVA were egregious breaches of duty the TVA owed to these plaintiffs and their citizens.

80. Jacobs was not to deviate from their legal and contractual obligations no matter who from within the TVA sought to influence them.

81. The EPA, the TVA, individual Residents, Citizens, and nearby landowners depended upon Jacobs to act in good faith, with competence, knowledge, integrity, professional skill, and independence free from improper influence regarding the safety of fly ash to workers and the public.

82. The EPA, the TVA, individual Residents, Citizens, and nearby landowners relied to their detriment upon Jacobs to act in good faith, with competence, knowledge, integrity, professional skill, and independence free from improper influence regarding the safety of fly ash to workers and the public

83. Jacobs acted with callous disregard for the health and lives of the citizens of Roane County, Tennessee.

84. TVA and Jacobs contributed to ash migration onto public and private property that increased local governmental and residential maintenance cost in various areas of the community.

85.     Jacobs was aided in their actions and inaction by certain agents for the TVA, including, but not limited to, Ms. Anda Ray and Mr. Scott Brooks who made misleading statements to the plaintiffs and the community as a whole as regards the safety of fly ash.

86.     TVA and Jacobs managerial agents manipulated the Jacobs PR representatives at the local site to unintendedly disseminate false information regarding fly ash safety, that still continues .

87.     These plaintiffs and their citizens relied to their detriment on the representations by the TVA and Jacobs that fly ash was safe.

88.     Plaintiff and the putative class did not know and could not have known the truth about the dangers of fly ash prior to November 7, 2018 when a jury in *Adkisson v. Jacobs*, EDTN 3:13-cv-505 determined that fly ash was capable of causing hypertension, coronary artery disease, lung cancer, leukemia and other hematologic malignancies, skin cancer, allergic contact dermatitis, peripheral neuropathy, asthma, chronic obstructive pulmonary disease, and respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema.

89.     By law, Jacobs and all agents for TVA were responsible for providing accurate information about the safety of fly ash to all of Roane County, the State of Tennessee, and the TVA Board of Directors.

90.     The duty to accurately and truthfully report to Roane County, the State of Tennessee and the TVA Board of Directors gives rise to the claims of the Plaintiffs for the protections of its respective citizens' interest.

91.     The Defendants were required to report accurately and truthfully regarding all work and communication subject to the requirements of the EPA AOC and comply with law, subject to criminal penalty.

92.     Jacobs adopted a Site Wide Safety and Health Plan ("SWSHP") in part to appropriately disseminate truthful and accurate information relevant to cleanup of this environmental contamination/remediation project to the public during the asset recovery.

93.     Jacobs adopted a Site Wide Safety and Health Plan ("SWSHP") in part to appropriately and properly monitor the air for the benefit of the TVA, the cleanup workers, and Roane County communities and its citizenry, as well as for that of other surrounding counties.

94.     Jacobs' mandatory obligation was to protect the taxpaying citizens of Roane County as a highest priority, workers at the Site, and the general area in order to protect and restore portions of property and environment damaged by the Kingston (KIF) ash spill.

95.     The TVA contract with Jacobs was one in which the TVA contractually granted and relied upon Jacobs' independent decision-making for safety and management of the entire site as the "independent contractor."

96.     All actions described herein were recklessly or intentionally committed by Jacobs upon Plaintiffs.

97.     Jacobs' actions were totally outside the contracted scope and knowledge of the TVA Board of Directors.

98. Jacobs' actions were done, in part, to receive approximately sixty-three millions of dollars ($63,000,000.00) in contract payments and bonuses.

99. Jacobs' actions and inactions violated existing law, the EPA AOC, the TVA contract requirements, the SWSHP and common decency.

100. Despite Jacobs' duties under this multi-million dollar agreement with TVA, it acted outside the scope of the TVA Board of Directors, the EPA AOC and exceeded its authority by fraudulently manipulating, destroying, and falsifying air monitoring results.

101. Further, upon knowledge, information and belief, Jacobs made numerous representations to the TVA and others that fly ash was not harmful to human health. These representations are contrary to the safety plan documentation adopted, created, and possessed by Jacobs and TVA in violation of the law.

102. Jacobs and certain agents of TVA, without the knowledge of the TVA Board of Directors, knowingly and intentionally lied to the plaintiffs, their citizenry and communities about the safety of fly ash constituents.

103. These actions fell outside the scope of the authority conferred by the TVA Board of Directors, the EPA Order of Consent, and the law.

104. Jacobs' actions and inactions contributed to community aggravation and inconvenience, loss of governmental property values, lost tax revenues, and certain health care and emergency response costs.

105. Jacobs' intolerable conduct includes violations of law, including, but not limited to, ongoing continuing obligations pursuant to the Administrative CERCLA Order #

-04-2009-3766, the EPA AOC, the law, and matters of contract that have continued and affect the plaintiffs up to the present day.

106. TVA improperly permitted the false announcement of completion of the remediation to avoid EPA penalties and upon information and belief the site has not been properly or completely remediated which contributed to the recent and ongoing leaks of arsenic and radiation in excess of permissible exposure limits (PEL) and furthered the nuisance.

107. TVA obstructed the truth from the plaintiffs by illegally destroying video evidence.

108. Jacobs colluded and conspired to commit the same transgressions to conceal video evidence.

109. Defendants have spent large quantities of ratepayer monies attempting to hide the truth regarding the "safety" of fly ash.

110. These defendants have engaged in fraud, fraudulent concealment, violations of Federal and State statutes and regulations, outrageous conduct, promissory estoppel, detrimental reliance, negligent selection of Jacobs Engineering Group, Inc. as its Site Wide Safety Contractor, temporary nuisance due to the hidden dangers of the ash and the recent 2018 secret release of high levels of radiation and arsenic from KIF, reckless endangerment, obstruction of justice, and breach of contract as the Plaintiffs were known intended direct third party beneficiaries to the contractual agreement between TVA and Jacobs.

111.    Jacobs intentionally altered environmental test procedures and induced these plaintiffs and the public at large to rely on the altered, inaccurate information reported.

112.    The EPA determined that communications related to the spill at KIF and any other releases were to be open, honest, responsible, reasonable, scientifically reliable, and done in such a manner that is value laden with honesty of the health risk to protect individuals in reasonable proximity to toxic or hazardous substances contained in the ash.

113.    TVA and Jacobs did not comply with their legal or contractual obligations to the rate-paying plaintiffs and their citizens.

114.    Defendant TVA, in violation of numerous required legal disclosures, fraudulently sold and auctioned for sale homes and property following the spill and concealed from the buyers that the property and homes were toxic.

115.    Defendants engaged in fraudulent concealment of the dangers of the fly ash and outrageously told the plaintiffs it was safe and maintain this position to this day despite the verdict in *Adkisson*.

116.    As a result, the TVA, in failing to select a qualified prime contractor or safety contractor with specific extensive experience in the remediation of fly ash spills, TVA breached their promise to the Plaintiffs and the putative class, who are direct third party beneficiaries to the Jacobs contract.

117.    Jacobs was not qualified nor competent to do the job as marketed, bid for, and promised

118.    TVA promised to pay the medical expenses for people affected by the spill.

119.     Plaintiff and the putative class reasonably relied on TVA's promises, and as a result of this reliance, the good citizens of Roane County altered their approach to their own healthcare needs.

120.     The misrepresentations of Jacobs and the TVA had the net effect of covering up information used by physicians to treat plaintiffs' citizens.

121.     The TVA and Jacobs were ordered to protect the public pursuant to Administrative Order # -04-2009-3766 and law.

122.     The defendants did not protect the public.

123.     As a result of the improper repair of the fly ash impoundment a more recent and ongoing nuisance has arisen.

124.     Jacobs as the prime contractor and site manager is liable.

125.     TVA through its selection of Jacobs as its prime contractor to perform nondelegable duties is likewise liable and must be included herein as an indispensable party.

126.     The current leak contains unacceptable levels of arsenic and radiation and other toxic hazardous radioactive contaminants which are seeping into the groundwater and the Emory and Clinch rivers in Roane County, Tennessee, and upon information and belief into the aquifer or borrow water that supplies west Knox County, Tennessee.

127.     The TVA attempted to hide this information from the general public for months prior to the filing of this lawsuit.

128.    The TVA public relations department, often in conjunction with Jacobs, made representations to citizens and public officials that were not only misleading but fraudulent.

129.    The fraudulent statements were not discovered as such until a jury determined otherwise on November 7, 2018.

130.    Plaintiff and the putative class reasonably relied on the publicly disseminated information provided by the TVA and Jacobs.

131.    These Defendants conspired to keep secret from the public the constituents of the fly ash and that the fly ash contained radioactive material all of which is harmful to human health and the Plaintiff and the putative class.

132.    These Defendants conspired to keep secret from the public the constituents of the fly ash knowing that many living near and the remediation workers would need money for burdensome medical expenses and accurate information to relay to individual treating physicians to get proper medical care from problems caused by the fly ash.

133.    The promise of truthful disclosure of information was breached by Ms. Anda Ray and Public Relations Officer Scott Brooks and the breach has continued till this day at local Roane County meetings and the media.

134.    Ms. Ray as an agent of the TVA promised that the TVA would pay the medical expenses of those people affected by the spill.

135.    Ms. Ray and Mr. Scott Brooks promised that the fly ash was safe from 2009-2019.

136.    Plaintiff and the putative class relied upon Defendants' repeated false statements, thus inducing them to refrain from taking legal action against the defendants.

137.    This reasonable reliance and forbearance by Plaintiff and the putative class harmed the whole community.

138.    Had these Defendants conducted themselves in accordance with the law, the health problems and temporary nuisance stigma with the incurred damages would not have occurred.

139.    Considering all allegations in this complaint, it is averred that Jacobs bears primary responsibility because they were the site wide safety contractor designated to independently manage safety at the site.

140.    Based upon contract language, if any individual or entity were to engage in conduct contrary to AOC -04-2009-3766, Defendant Jacobs was required to do their primary job to protect human health and comply with law.

141.    Jacobs outrageously did not protect human health and comply with the law.

142.    In short, converse to other contractors that normally engage in similar forms of contracting, Jacobs, in the present action, actually acted in direct conflict with federal law and the TVA policy to such a criminally gross extent that it should not be tolerated by any just and civilized society.

143.    By engaging in the conduct enumerated in this Complaint, Defendants violated the following non-discretionary requirements of the law:

    a.   42 U.S.C. 7401, *et seq.*

    b.   *Tenn. Code Ann.* S 39-13-101;

    c.   *Tenn. Code Ann.* § 39-13-103;

d. *The Tennessee State Air Pollution Control Regulations*

e. *Tenn. St. Reg.* 1200-3-3;

f. *Tenn. St. Reg.* 1200-3-5;

g. *Tenn. St. Reg.* 1200-3-8;

h. *Tenn. St. Reg.* 1200-3-10;

i. *Tenn. St. Reg.* 1200-3-11;

j. *Tenn. St. Reg.* 1200-3-12;

k. *Tenn. St. Reg.* 1200-3-13;

l. *Tenn. St. Reg.* 1200-3-19;

m. *Tenn. St. Reg.* 1200-3-22;

n. *Tenn. St. Reg.* 1200-3-37;

o. *Tenn. St. Reg.*1400-15-01-.02; and

p. SARA Title III, *The Emergency Planning Community Right to Know*;

q. 18 U.S.C. 1961-1968;

r. 33 U.S.C. 1251 et seq.;

s. 42 U.S.C. 9601 et. seq.;

t. 42 U.S.C. 6901 et. seq.;

u. 40 C.F.R. 430(c);

v. SARA Act Title III (EPCRA) 42 USC 11001, et seq. (entitling Plaintiffs to all fines and damages) and related to reasonable response costs Plaintiffs incurred.

w. *Tenn. Code Ann.* 50-3-2001 *et. seq*.

x. *Tenn. Code Ann.* 39-13-103;

y. *Tenn. Code Ann.* 39-14-114;

z. *Tenn. Code Ann.* 39-14-903;

144. The effects of continued exposure to such hazardous substances proximately caused some citizens to contract illnesses from which they will never recover.

145. The healthcare costs incurred by Plaintiff and the putative class are astronomical in amounts of dollars.

115. The Defendants' actions caused damages to Plaintiff and the putative class requiring, measurable and fair, medical and scientific response costs.

147. This temporary nuisance has been enhanced by ongoing negligent leaks of toxins at KIF, other damages from the temporary nuisance created by the Defendants, violations of the ECPRA through SARA Title III, CERCLA, and RCRA, violating many provisions an Administrative Court Order, including, but not limited to, destroying evidence and witness tampering.

148. The actions and inactions of Defendants have culminated in extensive harm to the health of individuals living within an area limited in geographic scope near the spill.

149. Aside from this limited area, the rest of Roane County is one of the most beautiful and desirable communities in the country.

150. Defendants' actions have caused a negative impact upon the County.

151. Defendants provided inadequate responsive medical monitoring in the aftermath of the spill for the Citizens of Roane County, especially those approximately 40,000 people living within a reasonable geographic zone of the spill.

152. The people within this region had the likelihood, probability, or did experience health-related problems from the original spill from the hazardous fly ash constituents.

153. This inadequacy and dishonesty were outside the scope of authority conferred by the EPA Order of Consent and the law. TVA knew or should have known of the previous and therefore is complicity liable because TVA's duty under the AOC was nondelegable.

154.    But for the dishonest and reckless actions of the defendants, the spill would have presented a real danger to a reasonably confined geographic region of Roane County and the migration of the ash could have been contained and the damages limited.

155.    Without justification, defendants lied about the safety of the coal ash, new radiation and arsenic leaks, and kept from the public the ash contained asbestos until it was reported by the Knoxville News Sentinel in October of 2019.

156.    These ongoing economic losses have once again been aggravated with regard to the recent leaks of high levels of radiation and Arsenic.

157.    When this recent hidden leak is combined with an ongoing pattern of dishonesty, it has perpetuated a negative temporary nuisance stigma, for people are in a reasonable reactionary position of not knowing whether they are safe in proximity to this site.

158.    The stigma was created by these Defendants.

159.    Particularly, contrary to legal and moral principles, Jacobs and a limited number of certain agents of TVA had in their possession manuals for fly ash safety that contained vital information regarding fly ash toxins and constituents that were not properly disseminated to individuals in Roane County, nor the public, including, but not limited to, medically vulnerable populations (including the interests that are represented by the Plaintiffs).

160.    Jacobs created its own Site Wide Safety and Health Plan (hereinafter designated as the SWSHP) that it submitted to TVA for the adoption of the mandatory rules to be followed on site. Jacobs, along with certain agents of TVA, deviated from the SWSHP in such a manner it was a violation of the law. All of these allegations were a factor that

caused the damages herein complained to one of the most beautiful counties in the country.

161.    Internal documents indicate that a false portrayal of a positive health perception of the disaster was more important than actual human health.

162.    Samples of fly ash were to be collected in such a manner as to minimize litigation.

163.    Samples of fly ash were to be collected in such a manner as to be legally defensible.

164.    The perimeter fly ash monitors were soaked in water to lower the readings of toxic levels to misrepresent dangers to the public in favor of profit and avoidance of legal penalty.

165.    Air and water samples were destroyed and records of levels destroyed by Jacobs.

166.    Videotape and photos of conditions at the site showing vast amounts of airborne fly ash were destroyed by the Defendants in violation of the EPA AOC, the TVA/Jacobs Contract and the law.

167.    A prior TVA witness has already truthfully testified in a prior Federal proceeding that this would be outside the scope of the EPA AOC Order #-04-2009-3766 and the Defendants' ongoing legal and moral obligations.

168.    This Order was required to be followed by law, subject to potential criminal penalties, and other laws that forbid such outrageous conduct committed primarily by Jacobs, and certain limited individuals within the TVA.

169.    All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

170.    Jacobs went to such an extent to engage in a fraudulent cover up as to conceal their harmful intent that they hired former critical TVA employees, moved certain witnesses around or out of the country, and lobbied to unethically approach and represent fact witnesses with no affiliation to Jacobs to influence testimony, for which Court admonishment was received.

171.    Defendants' statements were so contrary to their public statements it represents the most grotesque of deviations of public decency.

172.    In their possession were numerous documents that fly ash constituents can cause cancer, but this was never effectively publicly disseminated.

173.    The Defendants, despite their knowledge did nothing to prevent exposure to fly ash for these Plaintiffs, and authorized callous cavalier statements that were calculated to mislead the public regarding safety.

174.    Statements including "fly ash was so safe you can eat it" was a theme stolen from the defense of other lawsuits involving fly ash that resulted in harm to human health of children and others from fly ash that resulted in findings of liability.

175.    This same mantra regarding fly ash was used in this case callously, and went to such an extreme that they endorsed statements in emails such as this related to fly ash causing cancer.

176.    One internal Jacobs/ TVA email regarding the safety of fly ash stated: " However, the more you are exposed, the more likely it becomes….that cancer will grow. It's like buying lottery tickets. If you just buy one ticket you probably won't win. If you buy many tickets, your chances increase." Such a comparison of the chances of cancer to the chance

of winning the lottery made the exposure to the toxic coal ash sound like a good thing rather than warning those Jacobs and TVA were charged to protect of its hazards. This is but one example of the callous disregard for human life that Jacobs subjected Plaintiff and the putative class to the cancer lottery.

177. Contrary to JEG agents' testimony at trial, 2013 communication on or shortly after a lawsuit involving the sick workers was filed indicate that Jacobs emails stated they were not considering hours of shift exposures during monitoring of the ash, which is an outrageous disregard for human health and life.

178. The Jacobs/TVA contract explicitly stated that JEG was to protect the public as did the Administrative Order of Consent and the other laws referenced herein.

179. Jacobs entered into the business of superfund remediation for monetary profit.

180. Jacobs engaged in dishonest fraudulent business dealings in pursuit of profit to ensnare the TVA rate payers fraudulently and economically.

181. The actions of Jacobs were to be independent, honest, without improper dealing or motives, free from conflict or influence, and to primarily protect human health and the environment, to present day TVA has attempted to conceal leakage into groundwater, air and land of improper amounts of of CCR and misrepresent safety and health issues.

182. The Defendants breached this direct intended obligation in law and contract to illegally receive rate payer money through bonuses.

183. The Defendants criminally neglected the people they were appropriated money to protect through their illegal enterprise constituting violations of 18 U.S.C. §§ 1961- 1968 and Plaintiffs request appropriate damages in accordance with the United States Code.

184.    A certain limited number of executives of both Defendants violated their own ethics directives of particular concern were a certain limited number of TVA executives who claimed that the constituents of fly ash were not harmful to human health even up until the present day despite the TVA signing an Agreed Administrative Order of Consent acknowledging fly ash poses an imminent harm to human health and the TVA now posts warning signs that fly ash is hazardous that violate the following provisions of the <u>TVA Executive Code of Conduct</u>, *in pertinent part,* as follows:

    I.    **General Principal.** TVA executives will hold themselves, and each other, to the highest standards of integrity, honesty and ethical conduct. …

    III…    2.    Foster a culture of honesty, integrity, and ethical and law-abiding behavior among other Executives and employees.

    3.    Take all reasonable measures to achieve responsible use of and control over TVA's assets and resources. All assets and resources are to be used for legitimate business purposes.

    4.    Provide constituents with information that is accurate, complete, objective, relevant, timely, and understandable. Assure full, fair, accurate, timely, and understandable disclosure in all filings with regulatory agencies and other public communications. …

    11.    Ensure employees understand their affirmative duty to report actual or suspected violations or laws or ethics requirements and the procedures and mechanisms available to them for reporting.

    12.    Maintain a workplace environment that prevents retaliation or reprisals against an employee who in good faith reports actual or suspected violations of law or ethics requirements. Retaliation against employees who report perceived violations and/or who participate in investigations as witnesses or in other capacities violates the law and TVA's policies on whistleblowers, expressing differing views and cooperating with the Office of Inspector General. Such retaliation is prohibited and will not be tolerated.

IV. **Implementation**. TVA Executives are accountable for full compliance with this Code of Conduct….

185. It was further concealed as corroborated by TVA agents through deposition that during the time of the remediation that the TVA was selling the coal combustion residuals and specifically fly ash from Kingston (KIF) for money in the commercial setting while TVA was acting as if the remediation was solely funded by rate payer dollars.

186. The TVA classified the costs of remediation a "Regulatory Asset" and the TVA decided to recover the cost of the cleanup from the ratepayers.

187. Instead of referring to the site of the largest environmental disaster in U.S. history as a "hazardous waste" site as suggested by the EPA, TVA decided to refer to the "clean up" as an "Asset Recovery."

188. Instead of posting warning signs for the public as recommended by EPA, TVA removed any warning signs at the direction of Anda Ray.

189. Instead of referring to the site as a decontamination project as recommended by the EPA with appropriate site controls, Jacobs' hierarchy, by and through Sean Healey (certified industrial hygienist), failed to provide adequate respiratory protection and air monitoring for the public even though Jacobs knew the particulates from the ash posed dangers to human health and the environment and the asset recovery was directed by Jacobs to be handled so as to limit any public perception of danger.

## CLASS ACTION ALLEGATIONS

190. Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

191.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class consisting of all other persons similarly

situated as members of the proposed Subclasses:

**Bodily Injury Subclass**
All current and former residents of Roane County who have been exposed to the toxic
coal ash sludge released from the Kingston Fossil Plant, by Defendants, to establish
medical monitoring as reasonably anticipated consequential damages resulting from their
exposure to the aforementioned toxins.

**Property Owners Subclass**
Current property owners in Roane Township who have owned and/or resided in their
current private residence for at least two years.

**Non-property owner Residents Subclass**
Roane Township Residents who have lived in or on private property within the township
for at least two years.

192.     Excluded from the classes set forth above are: (a) Defendants, any entity or

division in which Defendants have a controlling interest, and their legal representatives,

officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned

and the Judge's staff; (c) any class counsel or their immediate family members; (d) any

State or any of its agencies; (e) persons who are incarcerated and otherwise do not own or

reside in private residential property as identified in the two subclasses and herein; and (f)

any individual who otherwise would be included under one or more of the class

descriptions above, but who is already a party in a lawsuit for personal injury for a coal

ash related illness and/or  who does not own and/or reside in or on private property.

193.     Collectively, the Property Owner and Non-property Owner Subclasses are

referred to as the "Subclasses."

194.    The Subclasses and this action satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Class Action Allegations – Numerosity**

195.    The members of the Subclasses are so numerous that joinder of all members is impracticable. The population of Roane County is estimated to include approximately 8,000 current private residents. Plaintiffs believe that Subclass members can be easily identified from public records, such as: property tax records, municipal water records, and employment records. All such Subclass members may be notified of the pendency of this action by mail or via other public forums.

**Class Action Allegations – Typicality**

196.    Plaintiffs' claims are typical of the claims of the members of the Subclasses inasmuch as all members of the Subclasses are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

**Class Action Allegations – Adequacy of Representation**

197.    Plaintiffs will fairly and adequately protect the interests of members of the Subclasses and have retained counsel competent and experienced in class action and environmental litigation.

198.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Subclasses and have the financial resources to do so.

199.    Neither Plaintiffs nor their counsel has interests adverse to any of the Subclasses.

**Class Action Allegations – Predominance of Common Questions**

200.     Plaintiffs bring this action under Rule 23(b)(3) because numerous questions of law and fact common to class members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all class members. These common legal and factual issues include:

a.       Whether Defendants owed a duty to Plaintiffs and members of the Subclasses;

b.       Whether Defendants knew or should have known that their coal ash was unreasonably dangerous because it contains toxic constituents, including but not limited to heavy metals lead, arsenic, and cadmium and chromium;

c.       Whether Defendants knew or should have known that their coal ash contained heavy metals and other toxins that would be dispersed onto the surrounding community;

d.       Whether Defendants knew or should have known that the containment structure surrounding portions of the Class II landfill owned and operated by Defendant TVA at the Kingston Fossil Plant would fail, releasing more than a billion gallons of sludge and water into the nearby environment.

e.       Whether Defendants failed to warn private residents and/or property owners of the potential for harm from the toxic heavy metals and chemicals contained in coal ash;

f.       Whether Defendants became aware of health and environmental harm caused by coal ash and failed to inform members of the Subclasses; and

g.       Whether the members of the Subclasses have sustained damages and the proper measure of damages.

**Class Action Allegations – Superiority**

201.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

202.    Defendants have acted on grounds generally applicable to the Subclasses, thereby making appropriate final legal and equitable relief with respect to the class as a whole.

203.    Furthermore, as the damages suffered by individual Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually redress the wrongs done to them.

204.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

205.    There will be no difficulty in the management of this action as a class action. Plaintiffs' claims are typical of the claims of the members of the Subclasses inasmuch as all members of the Subclasses are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

**Rule 23(b)(2) Injunctive Relief**

206.    In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses as a whole, such that final injunctive relief is appropriate with respect to each of the Subclasses as a whole.

207.    Such injunctive relief includes, but is not limited to, an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and the

Subclasses to test for the presence of heavy metals and hexavalent chromium in their blood serum; and the implementation and funding of a medical monitoring program for the Plaintiffs and the Subclasses sufficient to monitor the Plaintiffs' and Subclasses' health to ensure they are adequately protected from the deleterious effects of heavy metals and other toxic chemicals contained in coal ash.

**Rule 23(c)(4) Certification of Particular Issues**

208.    In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the Subclasses seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

209.    The adjudication of each Defendant's liability, jointly and severally, involves issues and questions common to the entire class, such that certification pursuant to Rule 23(c)(4) is appropriate

**FIRST CLAIM FOR RELIEF**
**PROMISSORY ESTOPPEL**

210.    Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

211.    Jacobs and the TVA knew that the representations they made regarding the safety of fly ash and the remediation effort, both public and private, to Plaintiffs' and the putative classes' were false, and continues to present day.

212.    Defendants outrageously intended to cause Plaintiffs and others to continue to believe there were no health risks from the fly ash and forego medical evaluation and treatment for monetary gain.

38

213.    Plaintiffs and their carriers improperly incurred the expense, or did so personally for those who were uninsured adding to stress in some instances for those living near the spill.

214.    TVA repeatedly and fraudulently promised to pay medical expenses for people whose health was affected by the ash, but led them to believe the ash was safe so they refrained from seeking medical treatment.

215.    Instead of keeping this extremely important promise, TVA instead bought two jet planes and Dallas Cowboys owner Jerry Jones helicopter for a grand total of approximately thirty million dollars ($30,000,000.00). These were TVA purchases, however the payment of these bills to keep this promise of perceived moral obligation to those so affected would not have been a direct expense, but one likely from their insurance carrier.

216.    Defendants' fraudulent actions caused people to forbear medical examination and to omit relaying exposure information, symptoms, and conditions for medical assistance.

217.    The delay in seeking medical attention caused by these Defendants has created a need for enhanced medical response costs and Plaintiffs relied upon TVA promises to their detriment.

218.    The TVA should be forced to honor its promises and be ordered to pay the related response damages.

219.    Jacobs, through a Public Relations Director on site, disseminated all site safety information to the TVA.

220.    Upon knowledge, information and belief, Jacobs never discussed the hazards of fly ash in safety meetings in which the TVA public relations department or team members participated.

221.    Ms. Anda Ray and a few select TVA employees, who had to approve both Jacobs and TVA press releases fraudulently withheld accurate exposure, safety, and health information from Plaintiffs.

222.    The TVA negligently allowed this to occur with improper supervision over the public relations department.

223.    Again, the TVA and Jacobs were required by law to be truthful and accurate to assist in protecting human health.

224.    Plaintiffs, in justifiable reliance upon the climate created by and the TVA;s repeated statements that fly ash in the area within a reasonable circumference of the spill was safe, induced the citizens of the community to forbear getting proper medical treatment, prevented public health care providers from obtaining proper information, and substantially increased health care problems and costs.

225.    TVA promised that they would pay for everyone's medical expenses affected by the spill.

226.    As a direct and proximate result of Jacobs' fraud upon Plaintiffs, certain individuals have suffered various diseases and conditions, fear of disease, medical expenses, monitoring costs, pain and suffering, mental anguish, other personal injuries, an unfair community reputation and economic stigma, and other damages, with the exact amount to be proven at trial.

227. As part of their marketing scheme, Defendants spread and validated their deceptive messages through the following unbranded vehicles ("the Vehicles"): so-called key opinion marketing that was false about fly ash safety. The Defendants, who wrote favorable false publications journal articles and delivered support of these allegations were a factor that caused the damages herein complained.

228. Defendants disseminated many of their false, misleading, imbalanced and unsupported messages through publication because they wanted to manipulate trusting observers to believe it was safe in order to meet deadlines for bonuses and benefit through other means.

229. Through branded and unbranded materials, Defendants presented information and instructions concerning fly ash generally that were false and misleading.

230. In their promotion of the appropriate handling and testing of the fly ash Defendants knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves to the present day.

231. Rather than actually test the safety of fly ash appropriately for long-term exposure problems and release prevention, Defendants led the Plaintiffs and the public at large to believe that the tests were appropriately done.

232. Defendants created a body of false, misleading, and unsupported medical and popular impression about the fly ash that (a) understated the risks (b) overstated the safety and (c) was likely to alter public perception of the danger posed. The literature and

press releases were, in fact, intended to persuade doctors and the public that the fly ash was safe and minimize the perceived risk of disease and damage.

233. The extent of Defendants' disseminated and marketed information that was knowingly false, has now been exposed putting the public in a situation of disbelief that certain people and businesses do not want to risk living in in the area of the spill due to Defendants' false representations and exposure that has created confusion and uncertainty to the present day.

234. Upon information and belief, Defendants spent vast amounts of the TVA ratepayers' money to market the deceptive safety of the ash in an attempt to influence the public, healthcare providers, government agencies and officials, and the Plaintiffs which induced them to refrain from taking legal action.

235. As described in detail simply below, Defendants:

• Misrepresented the truth about how fly ash is harmful to human health.

• Misrepresented that the fly ash was being tested appropriately.

• This fraud prevented adequate assessment of the health risk from flu ash exposure in regard to an area reasonably close to the spill.

• These fraudulent actions induced doctors, patients, and ratepayers from making/ knowing decisions by use of misleading terms that fly ash is safe.

• Falsely claimed that fly ash (and dust) was adequately managed;

• Misrepresented that exposure doses pose no risks to certain residents who lived or worker in an area close to the spill.

• Falsely omitted or minimized the adverse effects of fly ash exposure and overstated the safety of fly ash and knowingly did not protect from its harm

- Have continually to current day had radiation and arsenic leaks beyond permissible exposure limits, and airborne asbestos that TVA tried to keep secret from the Plaintiff's in reckless violation of integrity and law.

- All of these allegations were factors that caused the damages herein complained to one of the most beautiful counties in the country.

236.    All these acts caused the Plaintiffs and the putative class to rely reasonably upon the Defendants' ongoing fraud, causing the Plaintiffs and the putative class to not properly relay levels of fly ash exposure to healthcare professionals. This created a greater current need for medical surveillance, health care, and medical response costs that TVA had promised to pay the citizens of Roane County, including Plaintiffs and the putative class.

## SECOND CLAIM FOR RELIEF
### Fraudulent Concealment

237.    Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

238.    Plaintiffs hereby assert their cause of action for Fraud against the defendants that occurred outside the scope of law, the EPA AOC, and contractual obligations placed upon all who were bound to the TVA/Jacobs contract of which the Plaintiffs and the putative class were direct intended third party beneficiaries and including the ratepayers that were contrary to contractual purpose. Upon information and belief, due to various economic motives, certain TVA agents and employees, a select number of individuals concealed the dangers of the ash and problems associated with the project to their own board of directors. In so doing, they also acted outside the scope of the EPA AOC, outside the

scope of the TVA/Jacobs contract without the true knowledge of others at TVA. Jacobs was the primary actor in said concealment as referenced in this Complaint.

239. Upon information and belief, these limited number of individuals from TVA were motivated by the massive amounts of money and job perks (such as the use of the helicopter purchased from Dallas Cowboy's owner Jerry Jones, and the use of recently purchased jets that equated to a combined total of approximately thirty millions of rate payer dollars ($30,000,000.00), an extravagant salary of eight million dollars of ratepayers' money ($8,000,000.00) in annual payment to its CEO Bill Johnson, none of which was paid by insurance proceeds as the TVA has publicly portrayed in the community).

240. Jacobs was motivated by a huge bonus structure that ignored accurate safety protective measures to preserve human health and lied about safety at the site continuously.

241. Upon information and belief, one primary materially motivated employee/agent was Anda Ray, Senior Vice President over the spill, who had an extremely large salary, incredible benefits, and the potential for astronomical bonus dollars.

242. Upon information and belief, the fraudulent concealment of the toxicity of the ash by Jacobs and certain limited agents of TVA, including Ms. Ray, induced residents within close proximity of the spill to neglect seeking medical evaluation and treatment, and proper relaying of medical history to their doctors for economic gain and to minimize individual suits.

243. This fraudulent concealment induced the forbearance of people relaying accurate symptoms and also kept them from seeking treatment, amounted to crucial breaches of contractual promises relied upon by those living within a reasonable area from the spill and working on site. This fraudulent concealment was done to protect inordinate bonuses for Jacobs and certain limited people within TVA to receive massive benefits at the ratepayers expense.

244. As stated, in Jacobs' and TVA's possession were documents that accurately referenced toxic constituents, target organs, and symptoms of the harmful exposure of the fly ash to the members of the community who were exposed to the harmful ash or who lived nearby. One example of such information is entitled "Fly Ash Constituent Information." This information was not properly disseminated in accordance with law to Plaintiffs' and the putative class. Some of the toxic constituents included, but were not limited to: radium, cesium, uranium, radium, thorium, cesium, boron, vanadium, arsenic, silica, mercury, lead, beryllium, and other constituents some of which have been historically known to be used in chemical warfare.

245. The communities deserved to know and were promised the truth about the "safety" of fly ash.

246. The fraudulent concealment of this information to protect human health should have been disseminated to community officials and residents in accordance with TVA's safety directives and the Emergency Planning and Community Right to Know Act. Failure to warn by Defendants is a violation of the legal obligations that interfered with the public's right to know in violation of the EPA AOC, OSHA- CERCLA- and RCRA

and various other laws that impose these legal duties to the Defendants with regard to the duty to inform and protect the general public.

247.    Furthermore, upon information and belief, the number of toxins, quantity of toxins, routes of exposure, and target organs were recklessly omitted from the initial Site Wide Safety Plans that were drafted for the years preceding 2013.

248.    Certain agents from the TVA and Jacobs should have honored the legal obligation to have truthful, thorough knowledge, and communicate pursuant to the ECPRA, SARA Title III, NCP, 40 C.F.R Part 355 *et. seq*. and NEPA, to the Plaintiffs, this they did not do.

249.    Jacobs knowingly and intentionally lied to subcontractors regarding the safety of the toxicity of the fly ash. Jacobs Safety Manager, Tom Bock, echoing the previously written response to the EPA and others of Sean Healey, stated you can "eat a pound of fly ash per day for the rest of your life before it will ever hurt you" – although this is patently untrue.

250.    Jacobs committed fraud by not informing Plaintiffs and the putative class that the Site did contain toxic constituents or other hazardous substances including radioactive elements.

251.    The information known by Jacobs was concealed falsely and Jacobs acted with reckless disregard as to whether or not its representations were false, as did certain people within TVA.  TVA failed to prevent the dissemination of false information.

252.    Jacobs failed to use due care and honesty regarding the accuracy of its statements to Plaintiffs and the putative class and deviated from its own Site Wide Safety and Health

46

Plan and TVA did same trying to enhance their credibility by promises made to the TVA ratepayers and Roane County residents.

253. Plaintiffs and the putative class would have sought economic and medical assessments to appropriately deal with the original ash spill on the Site had they known of the appropriate zone of true airborne contaminants.

254. Plaintiffs and the putative class would have sought economic and medical assessments to appropriately deal with the original ash spill on the Site had they known of the dangers of prolonged exposure in response to the spill, the constant manipulation of environmental and health facts, ongoing leaks, and coverups.

255. As a direct and proximate result of Defendants' on-going fraud upon Plaintiffs and the putative class, certain members of the community, have illnesses, fear of disease, medical expenses, medical response monitoring costs, pain and suffering, mental anguish, other personal injuries, and other damages with the exact amount to be proven at trial.

256. Defendants accomplished false perceptions through a coordinated, sophisticated, and highly deceptive marketing campaign that began in the late 1990s and which became more aggressive in or about 2006, and continues to the present.

257. Defendants accomplished their marketing campaign goal by convincing doctors, patients, and others that the fly ash had little, if any, risks, and that fly ash was safe.

258. Defendants, individually and collectively, knowing that long-term or intense short term exposure causes harm to human health, misrepresented the dangers of long-term exposure to physicians, pharmacists, and patients by engaging in a campaign to minimize the risks of various forms of exposure to the fly ash.

259. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

260. These Defendants intentionally hid from the public that fly ash was particularly dangerous to children capable of causing birth defects, neurological disorders such as autism, pediatric depression, immunological and other problems and withheld this information from the Roane County Community, which has continued to the present day.

261.

262. The Defendants further withheld information regarding the dangers of fly ash and the methods by which the toxins can be distributed into homes through automobiles, clothing, air migration, and other means to harm children.

263. As a result, the Plaintiffs hereby move the court pursuant to Fed. R. Evid. 201 to take Judicial Notice of the fact that for children so affected or exposed the statute of limitations would not run until one (1) year past the age of majority under *Tenn. Code Ann.* § 28-2-106.

264. As stated, TVA has also fraudulently concealed to current radiation and arsenic leaking into the ground water, as well as windblown asbestos, and threatened workers not to provide nor collect evidence of or that they would be fired.

### THIRD CLAIM FOR RELIEF
**Intentional or Reckless Failure to Warn**

265. Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

266. Defendants breached their duty by not only failing to warn Plaintiffs, but actually fraudulently concealing the fact from Plaintiffs, and, upon information and belief, the TVA Board of Directors.

267. Defendants' breach of the duty to warn caused Plaintiffs to feel comfortable inside the environment containing the ash, without knowing whether it was safe or to seek protection, and to be exposed to high concentrations of toxins during that period of their frequent exposure.

268. Defendant TVA now warns that fly ash is hazardous, despite its numerous prior representations to the contrary.

269. As direct and proximate result of Defendants' reckless failure to warn, Plaintiffs have suffered injury both economic and personal injury, with the exact amount to be proven at trial.

270. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country, including the current asbestos, radiation and arsenic leaks beyond (PEL's) into the groundwater and windblown asbestos, toxins and other contaminants

## FOURTH CLAIM FOR RELIEF
### Negligence

271. Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

272. As the owner and operator of the Kingston Fossil Plant, Defendant TVA owed a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise

due care in the operation, maintenance, handling, design, testing, and inspection of the plant, including the landfill and all related containment structures, including but not limited to the ash (fly and bottom) retention ponds, dredge cells, stilling ponds, chemical treatment ponds, coal yard drainage basins, dikes, pools, sluice and intake channels, drains, catch basins, engineered wetlands, and all its associated ash, coal combustion products ("CCPs"), and other coal waste treatment and handling facilities, systems, and methods, and to prevent the massive spill of ash waste which occurred on December 22, 2008, which invaded and contaminated the Plaintiffs and the putative class' properties and the local environment and ecosystems and which pose a danger to Plaintiffs' health and safety.

273.    At all times relevant to this litigation, Defendant TVA knew or should have known that:

   a.  ash and other CCP wastes are hazardous to human health and to the environment and ecosystems;

   b.  ash and other CCP wastes must be stored and disposed of in a safe manner and prevented from escaping offsite onto private and public lands and into the environment and ecosystems;

   c.  ash and other CCP wastes contain substances which are hazardous to human health and to the environment and ecosystems;

   d.  the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds, pools, dredge cells, dikes, and berms must be adequately and timely inspected, maintained, and repaired in

order to prevent the escape of ash and other CCP wastes offsite onto private and public lands and into the environment and ecosystems;

e. the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells and associated dikes and berms must be adequately designed, constructed, and maintained in order to prevent the escape of ash and other CCP wastes offsite onto private and public lands and into the environment and ecosystems;

f. remediation and abatement must be adequately and timely conducted if ash and any other CCP wastes, and the hazardous substances which they contain, escape from the retention ponds and dredge cells and contaminate the Plaintiffs' properties and local environment and ecosystems; and

g. Plaintiffs and the putative class, public officials, and government agencies should be adequately and timely warned of the harmful effects of ash and any other CCP wastes, and the hazardous substances which they contain, which escape from the retention ponds and dredge cells and contaminate the Plaintiffs' properties and the local environment and ecosystems.

274. Defendant TVA's conduct fell below the duty of care owed to the Plaintiffs amounting to a breach of that duty. Defendant TVA owed the Plaintiffs and the putative class the following duties:

a. duty to store, process, and dispose of waste products, including ash and other CCP wastes and hazardous substances, in a safe manner;

b.  a duty not to create conditions at the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells, that would injure Plaintiffs and the putative class;

c.  a duty to adequately and timely inspect, maintain, and repair the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells and associated dikes and berms;

d.  a duty to adequately design and construct the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells and associated dikes and berms;

e.  a duty to prevent ash and any other CCP wastes, and the hazardous substances which they contain, from escaping from Defendant TVA's property, its Kingston Fossil Plant, and its retention ponds and dredge cells and contaminating the Plaintiffs' properties and the local environment and ecosystems;

f.  a duty to remediate and abate ash and any other CCP wastes, and the hazardous

g.  substances which they contain, which escape from the retention ponds and

h.  dredge cells and contaminate the Plaintiffs' properties and the local environment

i.  and ecosystems; and

j.  a duty to warn the Plaintiffs and the putative class, public officials, and government agencies of the

k.  harmful effects of ash and any other CCP wastes, and the hazardous substances

l.  which they contain, which escape from the retention ponds and dredge cells and

m.  contaminate the Plaintiffs' properties and the local environment and ecosystems.

275.  Plaintiffs and the putative class suffered injury and loss as a result of Defendant TVA's breach of their aforementioned duties. Specifically, Defendant TVA breached their duties owed to the Plaintiffs by:

a.  failing to properly, adequately, and timely store, process, and dispose of waste products, including ash and other CCP wastes and hazardous substances, in a safe manner;

b.  creating conditions, or preventing the creation of conditions, at the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells, that would injure Plaintiffs;

c.  failing to properly, adequately, and timely inspect, maintain, and repair the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells and associated dikes and berms;

d.  failing to properly, adequately, and timely design and construct the Kingston Fossil Plant and its associated ash and CCP waste handling facilities, including its ash retention ponds and dredge cells and associated dikes and berms;

e.  failing to prevent ash and any other CCP wastes, and the hazardous substances which they contain, from escaping from Defendant TVA's property, its Kingston Fossil Plant, and its retention ponds and dredge cells and contaminating the Plaintiffs' properties and the local environment and ecosystems;

f.  failing to remediate and abate the ash and any other CCP wastes, and the hazardous substances which they contain, which escaped from the retention ponds and dredge cells and contaminated the Plaintiffs' properties and the local environment and ecosystems; and

g.  failing to warn the Plaintiffs and the putative class, public officials, and government agencies of the harmful effects of ash and other CCP wastes, and the hazardous substances which they contain, which escaped from the retention ponds and dredge cells and contaminated the Plaintiffs' properties and the local environment and ecosystems.

276.    Despite Defendant's mandatory obligations, these fly ash constituents and other hazardous substances have remained present in the air, soil, and groundwater, and waterways in Roane County, Tennessee.

277.     TVA recklessly selected Jacobs as its prime contractor and site manager and did not communicate appropriately with safety issues involving the public.

278.     TVA recklessly failed to properly vet or otherwise determine the competency of Jacobs or their personnel prior to awarding the contract.

279.     TVA recklessly failed to properly require by contract adequate safety precautions and personnel for the citizens of Roane County, Tennessee.

280.     The improper negligent handling of the fly ash, caused by Jacobs, resulted in the ash becoming airborne and allowed for windward erosion throughout the Site and Plaintiffs' and the putative classes' properties, allowing unsafe contact, inhalation, and ingestion.

281.     Jacobs recklessly required its subcontractors to wet and suppress fly ash around stationary air monitors and wash the monitors to lower readings so that the public, including Plaintiffs and the putative class, would not know how to best respond and protect the people, businesses, and prospective business and residents.

282.     These outrageous actions were contrary to Defendants' obligations and scope of law, authority, and any legitimate purpose.

283.     Despite Jacobs alleged or imputed knowledge of fly ash hazards and its duty to prevent it from migrating onto as well as into properties nearby in a reasonable area within the spill, the multibillion dollar company did not adhere to this serious duty of protecting human health.

284.     Jacobs knew or should have known the dangerous consequences to those living within a reasonable area of the spill.

285.    Jacobs was unqualified to undertake the job with the personnel that were involved.

286.    TVA negligently contracted with an inadequate Jacobs and did not protect the public.

287.    Jacobs deviated from exercising reasonable judgment by engaging in negligent failure to protect human health, property in the local communities, and tax revenues of the communities, which include funding for schools.

288.    The damages alleged herein were caused by Jacobs committing impermissible reckless or intentional deviations from its Site Wide Safety and Health Plan, and damaging the people Jacobs was contractually obligated to protect.

289.    Jacobs acted intentionally and recklessly in bad faith disregarding human health, property, and the local business community; which was at the very essence and unique nature of its purpose of TVA contracting with Jacobs as the complete site wide "independent contractor" for management and safety.

290.    TVA negligently or recklessly selected Jacobs as its site wide safety contractor based upon Jacobs' lack of experience in fly ash and CERCLA superfund remediation projects.

291.    The plaintiff communities' health was not protected in an area comprising approximately 20,000 people living close or in the vicinity to the spill, and countless others affected by the spill, some of whom are very sick and suffering significant medical problems as a proximate result of Jacobs' deviations from the SWSHP and breaches of the TVA contract.

292. The medical and economic needs of the community were voluntarily undertaken by the TVA and were additionally mandated by the EPA AOC.

293. The TVA should be required to keep their promise to pay responsive individual medical bills and surveillance for these individuals, and the others who need yearly medical care for current or future medical response to health issues, including but not limited to, response cost of future health care evaluations and treatment due to the fraud committed by the Defendants upon which Plaintiffs were induced to rely.

294. The Defendants' cover up, as well as the recent leak of arsenic and radiation that occurred, has created and enhanced further negative economic impact when coupled with Defendants' ongoing dishonesty and concealment of ash safety and sporadic leaks at KIF.

295. Due to their fraudulent pathological untruthfulness regarding prior environmental cover-ups and the new leaks, a new ongoing nuisance stigma has been further egregiously aggravated.

296. Jacobs was negligent by failing to hire and train employees and independent contractors and subcontractors in applicable policies or procedures for working at the Site and for day-to-day safety.

297. Jacobs was negligent by failing to hire and train employees and independent contractors and subcontractors in public health, operations and management.

298. Jacobs was negligent for inadequate performance by failing to implement contracted promises to TVA and its site remediators, including contractors and subcontractors, and Plaintiffs and the putative class.

299.    Jacobs was negligent for inadequate performance of implementing policies and procedures regarding health and safety as promised to TVA for independent contractors and subcontractors working on the Site, and Plaintiffs and the putative class relied upon them as a direct third party beneficiary to the TVA/Jacobs contract.

300.    Jacobs was negligent in the construction and implementation of approved safety and health plans for independent contractors working on the Site, and Plaintiffs and the putative class, relying upon them as a third party beneficiary to the TVA/Jacobs contract.

301.    Jacobs was negligent in the maintenance and the intentional altering and manipulating of toxic air monitoring results to TVA to create lower permissible exposure limits ("PEL") readings that directly violated TVA directives and its scope of authority, and violating other statutes and regulations, all of which caused injuries to Plaintiffs and the putative class relying upon them as direct third party beneficiary to the contract.

302.    Defendants knew, or should have known, that the previously referenced actions were non-discretionary, as maintaining site safety and adherence with directives, statutes and regulations allowed for no discretionary choice.

303.    Jacobs had actual notice of the seriousness of the potential problem with the air monitoring and lack of adequate safety and still chose to take little or no action to prevent serious injury to the plaintiffs and others with windward erosion.

304.    The Defendants' negligent acts and/or omissions described above proximately caused and continue to cause damage to Plaintiffs and the putative class in the form of economic loss, aggravation and inconvenience, lost revenues, medical bills, and other damages - for all of which they are liable in monetary damages.

305. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

## FIFTH CLAIM FOR RELIEF

### Negligence Per Se

306. Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

307. Plaintiffs refer to and re-allege the previously referenced violations of state and federal laws as referenced in the entirety of this Complaint. Jacobs and the TVA violated the following standards of conduct that breached its legal obligations:

a. 33 U.S.C. Ch. 23, Sec. 11151, *et seq.*

b. *Tenn. Code Ann*. § 50-3-101, *et. seq.*

c. *Tenn. Code Ann*. § 50-3-2001 *et seq.* as applied through SARA title III

d. *The Tennessee State Air Pollution Control Regulations*:

e. *Tenn. St. Reg.* 1200-3-3;

f. *Tenn. St. Reg.* 1200-3-5;

g. *Tenn. St. Reg.* 1200-3-8;

h. *Tenn. St. Reg.* 1200-3-10;

i. *Tenn. St. Reg.* 1200-3-11;

j. *Tenn. St. Reg.* 1200-3-12;

k. *Tenn. St. Reg.* 1200-3-13;

l. *Tenn. St. Reg.* 1200-3-19;

m. *Tenn. St. Reg.* 1200-3-22;

n. *Tenn. St. Reg.* 1200-3-37; and,

o. *The Roane County Natural Hazard Mitigation Plan.*

307. **Clean Water Act**: Congress has waived sovereign immunity for Defendant TVA which is regulated under the Federal Water Pollution Control Act ("FWPCA," "Clean

Water Act," or "CWA"), 33 U.S.C. § 1251 et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate FWPCA § 301(a), 33 U.S.C. §§ 1311(a), FWPCA § 402, 33 U.S.C. §§ 1342, and FWPCA § 404, 33 U.S.C. § 1344, among others.

308. **Resource Conservation and Recovery Act**: Congress has waived sovereign immunity for Defendant TVA which is regulated under the Federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate RCRA § 4005, 42 U.S.C. § 6945, and § 7002(a)(l)(B), 42 U.S.C. § 6972(a)(l)(B), among others.

309. **Tennessee Water Quality Control Act**: Defendant TVA is regulated, and sovereign immunity has been waived, under the Tennessee Water Quality Control Act ("TWQCA"), Tenn. Code Ann. §§ 69-3-101 et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate Tenn. Code Ann. § 69-3-108(b) and § 69-3-114(a) and (b), among others.

310. On January 12, 2009, the Tennessee Department of Environment and Conservation issued an Emergency Order under Tenn. Code Ann.§ 69-3-109(b)(l), finding that due to the ash spill from Defendant TVA's Kingston Fossil Plant "an emergency exists imperatively requiring immediate action to protect the public health, safety, or welfare, or the health of animals, fish, or aquatic life, or a public water supply, or recreational, commercial, industrial, agricultural, or other reasonable uses."

311. Defendant TVA is and continues to be in violation of its National Pollutant Discharge Elimination System Permit ("NPDES") #TN0005452 issued by the Tennessee Department of Environment and Conservation, Water Pollution Control Division.

312.    Tennessee Solid Waste Disposal Act: Defendant TVA is regulated, and sovereign immunity has been waived, under the Tennessee Solid Waste Disposal Act ("TSWDA"), Tenn. Code Ann. §§ 68-2ll-l0l et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate Tenn. Code Ann.§ 68-2ll-l04, including§ 68-2ll-104(1) and ( 4 ), among others.

313.    Defendant TVA has violated its Class II landfill permit issued under the Tennessee Solid Waste Disposal Act ("TSWDA"), Tenn. Code Ann. §§ 68-2ll-101 et seq., by the Tennessee Department of Environment and Conservation, Solid Waste Management Division.

314.    **Tennessee Safe Drinking Water Act**: Defendant TVA is regulated, and sovereign immunity has been waived, under the Tennessee Safe Drinking Water Act ("TSDW A"), Tenn. Code Ann. § 68-221-7ll et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate Tenn. Code Ann.§§ 68-221-711(4) and (5), among others.

315.    **Tennessee Hazardous Waste Management Act**: Defendant TVA is regulated, and sovereign immunity has been waived, under the Tennessee Hazardous Waste Management Act ("THWMA"), Tenn. Code Ann.§§ 68-212-101 et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate Tenn. Code Ann. §§ 68-212-105(1) and (4), among others.

316.    **Tennessee Air Quality Act**: Defendant TVA is regulated, and sovereign

317.    immunity has been waived, under the Tennessee Air Quality Act ("TAQA"), Tenn. Code Ann. §§ 68-201-101 et seq. Defendant TVA's catastrophic ash spill has violated and continues to violate Tenn. Code Ann. §§ 68-201-101 et seq.

318.    Defendant TVA's violations of these foregoing federal and state statutes, regulations, ordinances, rules, standards, and permits constitute negligence per se and Defendant TVA is liable therefor.

319.    All of Plaintiffs and the putative class' damages are the direct and proximate result of Defendant TVA's acts and/or omissions and violations of the foregoing federal and state statutes, regulations, ordinances, rules, standards, and permits and Defendant TVA is liable therefor.

## SIXTH CLAIM FOR RELIEF

## IMPOSITION OF LIABILITY ON TVA FROM JACOBS' VERDICT BY APPLICATION OF DOCTRINE OFFENSIVE NON-MUTUAL COLLATERAL ESTOPPEL AND FOR TVA'S NONDELEGABLE DUTY

320.    Plaintiffs refer to and re-allege the preceding paragraphs of this Complaint and incorporate them by this reference, as though fully set forth herein.

321.    Defendants' misrepresentations regarding the safety and efficacy of fly ash proximately caused injury to Plaintiffs and the putative class. The most recent release of impermissibly dangerous levels of toxic and radioactive hazardous substances into the ground water was yet again part of the pattern and practice of reckless dishonesty and cover up.

322.    The actions of these Defendants exhibit the callous disregard for human life, the environment, and the entire area that was one of the most beautiful counties in Tennessee. The previously referenced actions still continue despite a 2011 report from the TVA OIG (Office of Inspector General) that reprimanded the TVA omission of public safety.

323.    The Defendant The Tennessee Valley Authority admitted through the EPA AOC, which imposed a nondelgable duty upon TVA to remove the ash and keep people safe, that the fly ash produced by the TVA facility in Kingston, Tennessee constituted an "imminent danger to human health" on or about May 11, 2009.

324.    Despite this acknowledgement Defendants have issued hundreds of public statements that coal combustion residuals (CCR) were safe with the Defendant Jacobs Engineering Group's most recent release occurring on or about the month of April 2019, at normal levels, and posed no danger to human health.

325.    By accepting the EPA Agency's determinations in the Agreed Order of Consent, pursuant to 28 U.S.C. § 1738 requires federal courts to adhere to the doctrine of state agency decisions and requires even federal courts to give them full faith and credit as verified by the United States Supreme Court in *Kramer v. Chemical Constr. Corp.*, 456 U.S. 461,466 (1982); *Tenn. v. Elliot*, 478 U.S. 788, 796 (1986).

326.    This Order was reinforced by a jury verdict related to the exact factual issues in this case regarding liability and both the Court and Jury rendered merit based factual decisions through the Memorandum Opinion in 2012 as it relates to nuisance and the Jury Verdict in 2018 as it relates to dangers to human health.

327.    On or about February 6, 2009, TVA entered into a joint venture (enterprise) by contractual agreement to manage the CERCLA SUPERFUND toxic cleanup site for TVA.

328.    Under Tennessee common law the strict procedural precedent is that the negligence of one to a joint venture imputed to all others without fault. *Fain v. O'Connell*, 909 SW 2d 790 ( Tenn. 1995 ), *Cole v. Woods*, 548 SW 2d 640 ( Tenn. 1977 ).

329.    Defendants, jointly and severally, are bound as members of the joint enterprise.

330.    Pursuant to *Sterling v. Velisicol*, 855 F. 2d 1188 (6th Cir. 1988) strict liability is established in this action by the subject of the contract as "Ultra Hazardous Activity."

331.    Defendants were mandated to protect human life in a disaster that contained fly ash with concealed toxic radioactive hazardous materials — well over twenty five (25) toxic constituents — as designated in the Federal Register as "Toxic" at the KIF remediation site.

332.    As a result of hazardous mismanagement at the site on Nov. 7, 2018 a jury returned a verdict of contractually bound Jacobs Engineering Inc., determining that:

a.    Jacobs breached the TVA contract that were designed to protect human health, and;

b.    There were breaches of the Site Wide Safety and Health Plan ("SWSHP") developed by Jacobs (and adopted by TVA) which were meant to be strictly and mandatorily followed to comply with law, and to protect the public.

c.    The breaches by Defendant Jacobs were in direct contravention of the mandate and nondelegable duty of TVA to protect the Plaintiffs and their citizens; and,

d.    Coal ash can cause the listed illnesses and diseases.

333.    Judicial Estoppel is present as the issue of fly ash causing harm to human health has been established through internal documents, Administrative Order, and Verdict by jury.

334.    Pursuant to *Sterling v. Velsicol,* 856 F2d (6th Cir. 1988) chemical hazards such as fly ash constituents are subject to strict liability as they pose an imminent danger to humans and constitute a public nuisance.

335.    This Court can take Judicial Notice that TVA and Jacobs concealed the dangers of fly ash from the public and tried to assure the public fly ash controlled, handled, transported, and arranged for disposal by the Defendants is a temporary public nuisance.

336.    On or about August 23, 2012 the District Court for the Eastern District of Tennessee entered a Judgment/ Memorandum Opinion stating that TVA was liable for negligence in handling fly ash regarding the issue of liability for property damage based open theories of nuisance.

337.    The same claim is present in this action and has been reinforced by the recent jury verdict of November 7, 2018 designating the breaches of duty referenced and a jury determination that fly ash can harmful to human health if inhaled, ingested, or is in contact with eyes or skin.

338.    TVA has recently admitted that there are currently impermissible levels of toxic and radioactive hazardous substances, including, but not limited to, arsenic and Radium 226 and 228,  in the Roane County groundwater after yet another attempt to conceal the contamination.

339. The Jury's Verdict rendered November of 2018 determined Jacobs Engineering Group, Inc. breached its contract with TVA as its Manager of the CERCLA Superfund Site at KIF, breaching its obligation to protect human health in accordance with the TVA contract and its own Site Wide Safety and Health Plan that Jacobs created.

340. The jury in *Adkisson v. Jacobs Engineering*, EDTN 3:13-cv-505, determined that the fly ash could cause a myriad of injuries as referenced in the verdict form including hypertension, coronary artery disease, lung cancer, leukemia and other hematologic malignancies, skin cancer, allergic contact dermatitis, peripheral neuropathy, asthma, chronic obstructive pulmonary disease, and respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema.

341. Defendant Jacobs Engineering should be estopped regarding any issues regarding the breaches of the TVA contract, and a court able to take judicial notice that the conditions resulting from the breaches are at minimum a nuisance and dangerous. In this regard Jacob's coverup of these conditions enhances an uncertainty and distrust of any issues involving safety, that harms Plaintiffs and the putative class.

342. Pursuant to *Brown v. Arnold,* No. M2015-00762-SC-R11-CV (Tenn. 2016) the Plaintiffs and the putative class include a request that TVA should also be bound by the doctrine of offensive non-mutual collateral estoppel to prevent the Defendants from re-litigating these issues under *Brown* as a matter of policy, justice, and judicial economy based upon the following grounds:

a.  Plaintiffs and the putative class were precluded from litigating the same issues by the fraudulent concealment of the Defendants by refraining from action for being induced to believe fly ash was safe.

b.  The issues, fact, and laws were collectively substantially the same and encompassed in fact and law determinations in the prior proceedings so referenced above.

c.  A ruling in favor of the Plaintiffs prevents re-litigation of the same and internal documents uncovered in the prior proceedings are basically hidden admission kept from the public that admit knowledge and liability of the Defendants.

d.  Rapid conclusion is in the public interest and saves tax dollars.

e.  The Defendants misrepresented the dangers of fly ash precluding the Plaintiffs and the putative class from being joined in the prior litigation.

f.  Treating the issues regarding liability as determined serves the rate payers that deserve integrity and contract compliance of profiteering contractors that act outside the scope of law, societal purpose, policy, and a requisite levels of humanity.

g.  At minimum Jacobs should be estopped due to their level of reckless disregard for the Plaintiffs and others. They should not benefit from such a heightened level of unclean hands.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO PERFORM BASELINE MEDICAL
## AND PERIMETER AIR MONITORING

343.    Plaintiffs and the putative class hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

344.    As a result of the Defendants' negligence, the Plaintiffs and Subclasses have been subjected to exposure greater than normal background levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic and radioactive hazardous chemicals including but not limited to hexavalent chromium.

345.    As a proximate result of their exposure, the Plaintiffs and the Subclasses have a significantly increased risk of contracting a serious latent disease.

346.    A monitoring procedure exists that makes the early detection of such latent diseases possible.

347.    The prescribed monitoring regime for the early detection of latent diseases caused by exposure to toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals, is different from that normally recommended in the absence of the exposure.

348.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

349.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

## EIGHTH CAUSE OF ACTION
## PRIVATE NUISANCE

350.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

351.    The Property Owner Subclass members, as described above, are owners of real property with the right of possession.

352.    At all times relevant to the present cause of action, Defendant operated the Site which produced the toxic coal ash which became airborne and contaminated the Plaintiffs' and the Property Owner Subclass' properties.

353.    At the time the above-described, intentional, unreasonable, negligent, and/or reckless acts were performed by Defendant, Defendant had good reason to know or expect that large quantities toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals  would and/or could be introduced into the properties of Plaintiffs and the Property Owner class.

354.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals to be disbursed through the water and air and onto the land and property of Plaintiffs and the Property Owner Subclass.

355.    Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of toxic heavy metals including but not

limited to lead, arsenic, and cadmium, as well as other toxic chemicals chromium to be released into the air as well as the surface and ground waters in and around the Site.

356.    The introduction of unknown quantities of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals onto the property of the Plaintiffs and Property Owner Subclass unreasonably interfered with the use and enjoyment of their property.

357.    The damage to the homes, buildings, and personal property at their residences from the airborne coal ash has caused the Plaintiffs and the Subclass significant inconvenience and expense.

358.    This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

359.    By reason of the foregoing, Defendant is liable to Plaintiffs and the Property Owner Subclass for the damages that they have suffered as a result of Defendant's actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION
### TRESSPASS

360.    Plaintiffs reallege and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

361.    This cause of action is brought pursuant to the laws of Tennessee.

362.    Plaintiffs and property damage class members have suffered and are suffering a continuing trespass as a result of Defendants' conduct.

363.     Defendants created, transported, and stored coal ash in such a manner so as to cause repeated, separate, and recurrent injuries to Plaintiffs' properties.

364.     The surrounding area and Plaintiffs' properties, including soil, air, and water, have been and continue to be seriously contaminated as a result of the actions taken by Defendants in the creation, transport, and storage of coal ash.

365.     Thus, Defendants created a condition which has resulted in the continuing discharge of contaminants via surface water, groundwater, and air onto Plaintiffs' land which occurs to this day, and Defendants have breached their legal duties in failing to take action to remedy the condition.

366.     Defendants negligently, recklessly, and/or intentionally produced, stored, and transported coal ash so as to contaminate Plaintiff's and class members' property.

367.     As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation and monitoring costs to be determined at trial.

368.     Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

## DAMAGES SOUGHT BY THE SUBCLASSES

349.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

350.     Plaintiffs and the Subclasses seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

351.     Plaintiffs and the Subclasses also seek damages sufficient to fund a blood test program to pay for the costs or an initial blood test, and such follow-up blood tests that are deemed necessary, to determine the current levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium in the blood serum of the Plaintiffs and the Subclasses.

352.     Plaintiffs and the Subclasses seek monetary damages for each violation of the Claims for Relief. In particular, Plaintiffs and the Subclasses seek monetary damages:

(i)      sufficient to remediate class members' property from the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct;

(ii)     to compensate class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

(iii)     and for such other monetary damages as are required to fully compensate Plaintiffs and the Subclasses for the loss of value of their properties caused by Defendants' conduct.

353.     Plaintiffs and the Subclasses seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

354.     In addition to the above, Plaintiffs and the Subclasses seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to expeditiously test private properties or the presence of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium and to continue that testing until it is determined that the risk of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium contamination; to repair the homes and property that has been damaged as the result of airborne coal ash; to remediate the soil that has been contaminated with toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium; to establish and fund a blood testing program for Plaintiffs and members of the Subclasses; to establish and fund a medical monitoring program for Plaintiffs and members of the Subclasses; and to take all steps necessary to remediate the Affected Area

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues raised herein. *Thacker v. TVA,* 868 F. 3d 979.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray judgment against Defendants as follows:

A.      For fair compensatory damages from these Defendants which were incurred by Plaintiffs for the ongoing temporary nuisance, lost revenues, all physical injury response cost, disease response costs, fatal illness costs and response costs, the contractually promised medical response expenses as promised by the TVA, any further, medical response costs, emergency response cost, any other further response monies to which Plaintiffs and their citizenry are entitled. Further, the Plaintiffs pray for all response cost damages in accordance with the EPA AOC, the TVA/Jacobs contract, and law as a whole, and all other damages to which the Plaintiffs are entitled.

B.      An order requiring Defendants (i) to establish a blood testing program for Plaintiffs and the Subclasses; (ii) to establish a medical monitoring protocol for Plaintiffs and the Subclasses to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium; and (iii) to take all necessary steps to remediate the property and/ or residences of Plaintiffs and the Property Owner Subclass to eliminate the presence of toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium;

B.      For punitive damages in any amount a Jury determines or Court determines to be fair against Defendants as appropriate and/or treble all other damages to which the Plaintiff's may fairly be entitled.

C.      On all Claims for Relief, such other and further relief as this Court deems just and proper under the circumstances.

D.      Plaintiffs reserve the right to amend this Complaint against all parties, as the facts, through discovery, should warrant. Plaintiffs also hereby move in the spirit of the rules of the Eastern District of Tennessee that before any dispositive motions are filed at the onset of this case, pursuant to Fed. R. Civ. P. 12, that the parties confer in order to resolve any perceived conflict in pleading in the interest of judicial economy. Further, before the filing of any dispositive motions Plaintiffs would herby move for an adequate time for discovery.

E.      An award to Plaintiffs and Subclass members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial.

F.      An award of attorneys' fees and costs;

G.      An award of pre-judgment and post-judgment interest, as provided by law; and

H.      Such other and further relief as the Court deems just and proper.

I.      For such other, general relief to which these Plaintiffs may be entitled.

**Respectfully Submitted,** this 7th day of November, 2019.

/s/ James K. Scott
James K. Scott

/s/ Keith D. Stewart
Keith D. Stewart

/s/ J. Tyler Roper
J. Tyler Roper

Market Street Law PLLC
625 Market Street, 7th Floor
Knoxville, TN 37902
(865) 245-0989